1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11   SOUTH YUBA RIVER CITIZENS              No.  2:13-cv-00059-MCE-EFB
     LEAGUE,  a non-profit corporation, and
12   FRIENDS OF THE RIVER, a non-profit      No.  2:13-cv-00042-MCE-CKD
     corporation,
13                                           (Related Cases)
                  Plaintiffs,
14

15         v.

16   NATIONAL MARINE FISHERIES              **MEMORANDUM AND ORDER**
     SERVICE; REBECCA M. BLANK, as
17   Acting Secretary of Commerce;
     RODNEY MCINNIS, as Regional
18   Administrator of the NMFS Southwest
     Region; UNITED STATES ARMY
19   CORPS OF ENGINEERS; JOHN
     MCHUGH, as Secretary of the Army;
20   COLONEL WILLILAM J. LEADY, P.E.,
     as District Commander, Sacramento
21   District,

22                Defendants.

23

24

25

26

27

28

                                        1

1   YUBA COUNTY WATER AGENCY,

2                     Plaintiff,

3   NEVADA IRRIGATION DISTRICT;
    PACIFIC GAS AND ELECTRIC
4   COMPANY; STATE WATER
    CONTRACTORS, INC.; BROPHY
5   WATER DISTRICT, HALLWOOD
    IRRIGATION COMPANY,
6

7                 Plaintiff-Intervenors,

8    v.

9   NATIONAL MARINE FISHERIES
    SERVICE; UNITED STATES
10  DEPARTMENT OF COMMERCE;
    REBECCA M. BLANK, in her official
11  capacity as Acting Secretary of
    Commerce; RODNEY R. MCINNIS, in
12  his official capacity as Regional
    Administrator, Southwest Region,
13  National Marine Fisheries Service; U.S.
    ARMY CORPS OF ENGINEERS;
14  LIEUTENANT GENERAL THOMAS P.
    BOSTICK, in his official capacity as
15  Commanding General of  U.S. Army
    Corps of Engineers; and COLONEL
16  WILLIAM J. LEADY, P.E., in his official
    capacity as District Commander,
17  Sacramento District, U.S. Army Corps
    of Engineers,
18

19                 Defendants.

20

21

22       By way of the present litigation, two groups of Plaintiffs separately challenge the

23 propriety of a biological opinion prepared by the National Marine Fisheries Service

24 ("NMFS") in connection with the continued operation of two different dams maintained by

25 the Army Corps of Engineers ("Corps") and located along the upper portions of the Yuba

26 River in Northern California.

27 ///

28 ///

1  The first lawsuit is being pursued by two different environmental groups and argues that
2  by extending certain deadlines contained in the biological opinion at the request of the
3  Corps, the NMFS has violated provisions of the Endangered Species Act, 16 U.S.C.
4  § 1531, et seq. ("ESA") by exacerbating the risk to certain threatened fish.  The second
5  action, brought by the Yuba County Water Agency (five other water and power entities
6  have intervened as additional plaintiffs since the lawsuit was commenced), is concerned
7  not with fish but how measures to restore fish habitat, as advocated by the NMFS, may
8  adversely affect water and hydroelectric interests.

9  Presently before the Court is the environmental plaintiffs' request for preliminary
10  injunctive relief, as well as motions filed by the federal defendants in both lawsuits to
11  stay these proceedings.[1]   Stay is sought in order to allow the NMFS, which has already
12  agreed to revisit the conclusions contained in its 2012 study, to prepare a new
13  assessment that may well obviate the need for all or part of this litigation.  The defense
14  claims that allowing both actions to proceed simultaneously under those circumstances
15  would likely be both wasteful and inefficient.   The environmental plaintiffs, on the other
16  hand, argue that the Corps must implement certain safeguards to protect fish if any stay
17  is ordered, and seek a mandatory injunction to ensure that what they view as key
18  provisions of NMFS' current recommendations are followed in the meantime.

19  As set forth below, the Court finds that the environmental plaintiffs have not met
20  their burden of demonstrating the need for a preliminary injunction in this matter.  The
21  Court will, however, stay both actions pending issuance of a new biological opinion and
22  will further establish deadlines for completion of that opinion.

23  ///
24  ///
25  ///
26  ///

27  _____

[1] The defendants in both proceedings at issue herein will be collectively referred to as "federal
28  defendants" or "the government" in this Memorandum and Order unless otherwise indicated.

1

**BACKGROUND**

2

3    Both of these lawsuits, which were related by Order filed June 27, 2013,

4  challenge a 300-page Biological Opinion ("BiOp") issued on February 20, 2012, by the

5  NMFS.[2] The BiOp was prepared to evaluate the Corps' long-term operation and

6  maintenance of two dams along the upper Yuba River  ("the Project").  The BiOp

7  specifically addressed the effects of the project on three anadromous[3] fish species which

8  are listed as threatened under the Endangered Species Act ("ESA").  The affected

9  species include the Central Valley spring-run Chinook salmon, the Central Valley

10  steelhead and the southern green sturgeon.  The Yuba River provides habitat to three

11  ecologically significant units of those fish.

12    The Englebright dam, constructed in 1941 ("Englebright"), marks the division

13  between the upper and lower Yuba and is 260 feet high.  Englebright has no fish ladders

14  and completely blocks access of the migrating fish to the upper reaches of the Yuba.

15  The much smaller (26 foot) Daguerre Point dam, located about 10 miles downstream

16  from Englebright and built in 1910 ("Daguerre"), does have fish ladders initially

17  constructed in 1911 and most recently repaired in 1964 and 1965.  Those fishways,

18  located on either side of the dam abutment, do conceivably permit fish to travel

19  upstream.  Both dams were built to retain hydraulic mining sediment and debris released

20  into the Yuba by Gold Rush-era placer mining.

21    Between March 27, 2002, and November 21, 2007, the NMFS, which is entrusted

22  with safeguarding anadromous fish species like those involved here, issued three

23  different biological opinions regarding the Corps' activities at the two dams.  All three

24  BiOps concluded that the Corps' Project activities in operating and maintaining the two

25  dams did not jeopardize the three fish species.

26    _____
     [2] The 2012 BiOp is attached as Exhibit A to the Declaration of Howard Brown, ECF No. 44-3,
27  Case No. 2:13-cv-00042.

28    [3] An anadromous fish, born in fresh water, spends most of its life in the sea before returning to
   fresh water to spawn.  Anadromous species include both salmon and sturgeon.

1    The third November 21, 2007, BiOp ultimately prompted litigation by SYCRL that was

2    adjudicated before another court in this district.  In that case, the court ultimately found

3    that certain aspects of the 2007 BiOp violated the provisions of the ESA and its

4    implementing statutory framework under the Administrative Procedure Act ("APA").  See

5    South Yuba River Citizens League v. NMFS, 723 F. Supp. 2d 1247 (E.D. Cal. 2010)

6    (merits proceedings).   Following this decision the Corps voluntarily reinitiated

7    consultation with the NMFS in order to prepare a new BiOp.  That process resulted in

8    preparation of the 2012 BiOp that is the subject of the cases now before this Court.

9         The 2012 BiOp unlike its predecessors, concludes the Corps' project adversely

10   affects the concerned fish because it blocks access to 478 miles of suitable habitat

11   above Englebright for spring Chinook, 143 miles above Englebright for steelhead, and

12   2-7 kilometers above Daguerre for green sturgeon.   The BiOp concludes both that these

13   areas represent critical habitat  and that in its absence the continued existence of the

14   fish would likely be jeopardized. The BiOp further finds that upstream passage at

15   Daguerre is inadequate and that overlapping use of spawning areas below Englebright

16   by both spring and fall-run Chinook has resulted in hybridization of those previously

17   distinct species.

18        The new BiOp included reasonably prudent alternative ("RPA") measures that the

19   NFMS believed would help avoid jeopardizing the listed species.  The recommended

20   RPAs included various measures like near and long-term fish passage, gravel injection

21   to improve spawning habitat, predator control, channel restoration and species

22   monitoring.  The RPAs were to be carried out pursuant to a phased, decades-long

23   program of conservation to ameliorate the effects of the project on the listed fish.

24        The Declaration of Brad Cavallo, a fish scientist retained by one of the

25   environmental plaintiffs, the South Yuba River Citizens League ("SYRCL"),  opines that

26   achieving comprehensive long-term measures for fish protection will require measures

27   like the removal of Daguerre and Englebright  entirely, or the construction of completely

28   new structures or channels to allow fish passage past Daguerre and Englebright.

1  See Cavallo Decl., 2:13-cv-00059, ECF No. 29-2, ¶ 46.   Cavallo flatly states that "each

2  additional year the Corps fails to adequately mitigate [this] substantial harm … brings the

3  Listed Species closer to extinction and reduces the likelihood of recovery."  Id. at 47.

4  He argues that planning for volitional fish passage must begin immediately, as

5  envisioned by the BiOp, in order to be in place by 2020.  Id. at 51.  Another expert

6  retained by SYRCL, fisheries biologist Gary Reedy, concurs that timely passage of fish

7  passage design is critical to avoid jeopardy to the listed species' survival and recovery.

8  Reedy Decl., 2:13-cv-00059, ECF No. 29-3, ¶ 17.

9        After issuance of the 2012 BiOp, the Corps and NMFS held a series of meetings

10  between March and September of 2012 to discuss the Corps' concerns about

11  implementing the BiOp.   On November 27, 2012, the NMFS extended several RPA

12  deadlines to the Corps for various practical reasons, including the Corps' intent to

13  reinitiate the consultation proceedings that had led to the BiOp in the first place.  The

14  Corps expressed both scientific and technical concerns as well as concern that the

15  measures called for in the BiOp were beyond its statutory and fiscal authority to

16  implement.  Thereafter, on February 26, 2013, the Corps formally requested reinitiation

17  of consultation proceedings under Section 7 of the ESA and agreed to continue

18  implementing certain actions with near term completion dates that would benefit the

19  subject fish species during the period of additional consultation.    That consultation was

20  viewed as appropriate to address new scientific and technical information relevant to the

21  Corps' action on listed species,[4] to clarify the nature and scope of the Corps' action, to

22  clarify the scope of the action area, and to ensure that any RPA is within the scope of

23  the Corps' legal authority.  Decl. of Randy P. Olsen, 2:13-cv-00042, ECF No. 44-4, ¶ 15.

24  ///

25  ///

26  ///

27  _____

28        [4] By that time, two years of new information had been gathered since the 2012 Biological
Assessment, which included information and date only up to 2010.

6

1    The interim measures that the Corps agreed to implement pending the renewed

2    consultation proceedings include the inspection and maintenance of the Daguerre fish

3    ladders, placement and monitoring of 5,000 tons of gravel for spawning habitat,

4    salmonid redd surveys as specified in the BiOp, and the implementation and monitoring

5    of large woody material between Englebright and Daguerre, as also called for in the

6    BiOp.  The Corps viewed these measures as both within its authority and appropriations

7    its ability to carry out by way of funding appropriation.  The Corps further represented it

8    would not make any irreversible or irretrievable commitment of resources in the

9    meantime that would affect implementation of additional measures in the future.

10    The NMFS agreed to reinitiation as requested and, on April 11, 2013, committed

11    to develop the necessary schedule for those proceedings.  It believes that assuming

12    receipt of a sufficient underlying biological assessment from the Corps by October 22,

13    2013 as planned, a new BiOp can be prepared on or before May 12, 2014.

14    The Yuba County Water Agency ("YCWA") filed its lawsuit on January 9, 2013,

15    alleging that the 2012 BiOp contains "factual and legal inadequacies" under the ESA that

16    make it "arbitrary and capricious" under the Administrative Procedures Act.[5]  The

17    government contends that significant overlap exists between the claims raised in

18    YCWA's complaint and the issues identified by the Corps as the basis for reinitiation of

19    consultation.  YCWA's interest in the dams stems from hydroelectric power it obtains.

20    Controlled water releases from Englebright are made through two hydroelectric power

21    facilities that are owned, operated and maintained by the YCWA and PG&E,

22    respectively.  The powerhouses operate pursuant to licenses issued by the Federal

23    Energy Regulatory Commission ("FERC").

24    On March 18, 2013, the SYRCL (a second environmental group, Friends of the

25    River, was subsequently added as a second party plaintiff) filed its own lawsuit.

26    ///

27    _____

[5] As indicated above, five other water and power entities (the Nevada Irrigation District, Pacific Gas and Electric Company, The State Water Contractors, Inc., the Brophy Water District and the Hallwood Irrigation Company) subsequently intervened as additional plaintiffs in YDWA's lawsuit.

28

That action challenges federal defendants' compliance with the RPA recommendations as set forth in the 2012 BiOp, and further challenges federal defendants' alleged failure to proceed in a timely fashion that avoids jeopardizing the listed fish or adversely modifying their critical habitat.  SYRCL expresses particular concern with NMFS' consent to extend certain of the deadlines contained in the 2012 BiOp as requested by the Corps, and argues that extension was arbitrary and capricious.

Given the reinitiation of proceedings with NMFS, the Federal Defendants allege that a stay of both cases would avoid duplicative and wasteful litigation, and would also avoid delaying an administrative process that could be stymied if available resources have to be diverted to defending a BiOp that is already in the process of being superseded.  SYRCL asks that the Court grant preliminary injunctive relief,  in the event the action is stayed, in order to mandate that additional measures are taken  (beyond those steps the Corps says it will continue to implement in the meantime) to protect the subject fish species pending a new BiOp.  YCWA's concern with the 2012 BiOp stems from fear that its provisions will affect ongoing licensing proceedings with FERC.  YCWA asks that any stay order contain provisions that preclude reference to or reliance on the 2012 BiOp while reinitiation proceedings are underway.

**STATUTORY BACKGROUND**

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).  The ESA delineates several substantive mandates to achieve that stated goal.  ESA section 7(a)(2) requires Federal agencies to "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of or result in the destruction or adverse modification of designated critical habitat for such species."  16 U.S.C. § 1536(a)(2).

In addition to these measures which apply to a Section 7 challenge,  ESA section 9(a)(1)(B) also prohibits any "taking" of species listed as endangered under the ESA.

Whenever agency action "may affect" a threatened or endangered species or critical habitat, the agency must consult with the appropriate "consulting agency," here the NMFS.  50 C.F.R. § 402.14(a).  If the proposed action is "likely to adversely affect" a listed species or its critical habitat, "formal consultation" is required.  50 C.F.R. § 402.14(b).

Formal consultation begins when the action agency, here the Corps, transmits a written request to the consulting agency (NMFS).  This request can take the form of a "biological assessment" which describes the proposed action and evaluates its potential effects.  See 16 U.S.C. § 1536(c); 50 C.F.R. § 402.12.  Formal consultation concludes with the issuance of a biological opinion by the consulting agency.  50 C.F.R. § 402,14(l)(1).  The BiOp assesses the likelihood of jeopardy to the species as well as the likelihood that destruction or adverse modification of critical habitat will occur.  See 50 C.F.R. § 402.14(g).

Section 7(d) of the ESA allows an agency like the Corps to proceed with its intended activities after the consultation process is initiated so long as the action does not result in "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures…"  16 U.S.C. § 1536(d)

If the proposed action may cause jeopardy or adverse modification, the BiOp can include reasonable and prudent alternatives ("RPAs") that the consulting agency "believes would avoid the likelihood of" jeopardy or adverse habitat modification."  50 C.F.R. § 402.02.   RPAs must include measures that can "be implemented in a manner consistent with the intended purpose of the action, "that are consistent with the scope of the [action agency's] legal authority and jurisdiction," and are "economically and technologically feasible."  Id.

///

1    A BiOp may also include an Incidental Take Statement ("ITS") that if followed

2   provides the action agency with a safe harbor from liability under the Section 9

3   prohibition on take of listed species.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

4    An agency action can be reinitiated, as has occurred here, under certain

5   circumstances, including new information on the listed species, unanticipated levels of

6   incidental take, or new information on the proposed action.  50 C.F.R. § 402.16.  After

7   reinitiation of consultation, an action agency like the Corps may also proceed with its

8   action so long as it avoids the same "irreversible or irretrievable commitment of

9   resources" that could foreclose either formulation or implementation of any subsequently

10   developed RPA.  16 U.S.C. § 1536(d).

11    SYRCL's complaint here is premised on both Section 7 and Section 9 of the ESA.

12   Additionally, plaintiffs in the related YCWA lawsuit argue that the 2012 BiOp fails and

13   should be set aside either because of factual and legal inadequacies.  Given those

14   alleged shortcomings, the YCWA plaintiffs contend that the BiOp  is "arbitrary and

15   capricious",  made "without observance of procedure required or law," or "otherwise not

16   in accordance with the law" as set forth in the Administrative Procedures Act ("APA").

17   5 U.S.C. § 706(2)(A) and (D).

18

19    **ANALYSIS**

20

21   **A.    Environmental Plaintiffs' Motion for Preliminary Injunction**

22

23    Through this motion, the SYRCL and Friends of the River (collectively "SYRCL")

24   seek to compel the federal defendants to implement six more of the measures

25   recommended by the 2012 BiOp beyond those measures the Corps has already agreed

26   to take while reinitiation proceedings are pending.  SYRCL maintains, in accordance with

27   the BiOp's findings, that  Englebright and Daguerre are jeopardizing the survival and

28   recovery of the subject fish species.

10

1   The federal defendants oppose that request on grounds that the 10-month period during

2   which reinitiation proceedings will take place does not warrant the requested mandatory

3   injunction.   Since the measures at issue are designed to unfold over a twenty-year

4   period, and will address protection and survival concerns over a century, the government

5   maintains that the subject fish will not be irreparably damaged by the brief, ten-month

6   period it will take to obtain a new BiOp.

7

8          **1.      Standard**

9

10         Issuance of preliminary relief in advance of a decision on the merits is always

11   considered an "extraordinary and drastic remedy" (Munaf v. Geren, 553 U.S. 674,

12   689-90 (2008)) that "may be awarded upon a clear showing that the plaintiff is entitled to

13   such relief." Winter v. Natural Res. Def. Council, 555 U.S. 7, 22 (2008).  A party

14   requesting such relief must show that "he is likely to succeed on the merits, that he is

15   likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

16   equities tips in his favor, and that an injunction is in the public interest." Stormans, Inc. v.

17   Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting Winter, 555 U.S. at 20).

18   Alternatively, under the so-called "sliding scale" approach, as long as a plaintiff

19   demonstrates the requisite harm and shows that an injunction is in the public interest, a

20   preliminary injunction can still issue so long as serious questions going to the merits are

21   raised and the balance of hardships tips sharply in Plaintiff's favor. Alliance for Wild

22   Rockies v.Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (finding that sliding scale test

23   for issuance of preliminary injunctive relief remains viable after Winter).  In the context of

24   an ESA violation, because the balance of hardships and the public interest generally tips

25   heavily in favor of endangered species, the court can largely dispense with weighing

26   those factors so long as a merits violation is likely to have occurred and irreparable harm

27   is established. Sierra Club v. Marsh, 816 F.2d 1376, 1383-84 (9th Cir. 1987).

28   ///

1    In determining the likelihood of success in the context of a preliminary injunction,

2  agency action should be upheld in accordance with the provisions of the APA unless it is

3  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

4  Earth Island Inst. v. Carlton, 626 F.3d 462, 468 (9th Cir. 2010);

5    A request for mandatory injunctive relief, like that sought here, "goes well beyond

6  simply maintaining the status quo *pendente lite* [and] is particularly disfavored."  LGS

7  Architects v. Concordia Homes of Nev., 434 F.3d 1150, 1158 (9th Cir. 2006) (citation

8  omitted) (emphasis in original).  Therefore, "when a mandatory preliminary injunction is

9  requested, the district court should deny such relief, 'unless the facts and law clearly

10  favor the moving party.'"  Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1320 (9th Cir. 1994).

11

12    **2**.    **Analysis**

13

14    In attempting to show the requisite irreparable harm, the SYRCL argues that

15  Englebright blocks historic, highly valuable Upper Yuba habitat for the threatened

16  species and also cuts off key upstream tributaries.  According to Plaintiffs, Englebright

17  further traps gravel needed to create a health spawning substrate in the Yuba River

18  downstream from the dam.  Plaintiffs go on to assert that the 1964 fish ladders at

19  Daguerre are inadequately designed and operated.  Plaintiffs maintain that all these

20  factors impact both species' viability and habitat and further constitute an unauthorized

21  taking under the ESA given the precarious nature of the threatened fish.  Plaintiffs assert

22  that the federal defendants' refusal to do anything beyond maintaining the status quo

23  until a new BiOp is prepared constitutes both a Section 7 and a Section 9 ESA violation.

24    In response, the Federal Defendants point out that it has voluntarily agreed to

25  undertake those measures it has the authority and funding to carry out, including

26  salmonid surveys, gravel injection, placement of large woody material and improvements

27  to existing fish ladder operation.

28  ///

1    Since all these measures benefit the species, and since the government represents it

2    plans to take no affirmative action during the interim reinitiation period that would harm

3    the species in any way, it asserts that the requisite clear showing of irreparable harm has

4    not been made with respect to a Section 7 challenge to action affecting the species and

5    their critical habitat.

6          Plaintiffs must show a "definitive threat of future harm to protected species" under

7    Section 7 of the ESA; "mere speculation" as to the incremental possibility" of such risk is

8    insufficient.  Nat'l Wildlife Fed'n v. Burlington N.R.R.,  23 F.3d 1508, 1512 n.8 (9th Cir.

9    1994).  Moreover, "[i]rreparable harm to ESA listed species has to be measured at the

10   species level," and a "plaintiff must present a concrete showing of probable deaths

11   during the interim period and of how these deaths may impact the species."  Nw. Envtl.

12   Def. Ctr. v. U.S. Army Corps of Eng'rs, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011)

13   (quotation omitted).

14         Additionally, with respect to a Section 9 "taking" claim under the ESA, the

15   environmental plaintiffs must make a "concrete showing of probable deaths during the

16   interim period" and demonstrate "how those deaths may impact the species."  Id. at

17   1317.  To meet this burden, plaintiffs must prove by a preponderance of the evidence

18   that a "reasonably certain threat of imminent harm to a protected species" exists.

19   Marbled Murrelet v. Babbitt, 83 F.3d 1061, 1066 (9th Cir. 1996); Defenders  of Wildlife v.

20   Bernal, 204 F.3d 920, 925 (9th Cir. 200).  A "potential" injury to the species is

21   "inadequate to establish Section 9 liability."  Swinomish Indian Tribal Cmty. v. Skagit

22   Cnty Dike Dist. No. 22, 618 F. Supp. 2d  1262, 1270 (W.D. Wash. 2008).  Plaintiffs have

23   not made the requisite showing under either Section 7 or Section 9.

24         Here, any impact to the affected species must be seen in context.  The

25   Englebright Dam has been in place, and has blocked fish passage to the upper Yuba

26   River, for more than seventy years.  The Daguerre Point Dam was constructed over a

27   century ago.  Any effects upon Chinook, steelhead and sturgeon have been ongoing for

28   decades.

1    Aside from arguing in conclusory fashion that the species are now at a critical point,[6]

2    Plaintiffs have made no real effort to quantify the effects of continued dam operation on

3    these species, and more importantly have made no attempt whatsoever to quantify any

4    impact occurring during the interim 10-month period that will elapse between now and

5    the expected completion of a new BiOp in May of 2014.  The relevant inquiry for

6    preliminary injunction purposes is whether the requested relief is necessary to avoid

7    irreparable harm during the interim period that the relief is to be provided.  N.W. Envt'l

8    Def. Ctr. v. U.S. Army Corps of Eng'rs, 817 F. Supp. 2d at 1315.

9        Given the decades that the dams in question have been in place, the problematic

10   nature of establishing irreparable harm based on a 10-month window is hardly

11   surprising.  In addition, the RPAs called for in the 2012 BiOp in themselves look to the

12   long rather than the short term.  That is consistent with the fact that population viability

13   analysis for risk to the subject fish species is evaluated over a 100-year time frame, and

14   not over a period of months as Plaintiffs would have the Court believe.  Decl. of Howard

15   Brown, 13-cv-00059, ECF No. 34-1, ¶¶ 16-17.  The approach taken by the 2012 BiOp is

16   consistent with this analysis.  In assessing long-term survival and viability, the BiOps'

17   conclusions are based on modeling and scientific inferences projecting effects on the

18   listed species over a span of 100 years.  2012 BiOp, Ex. A to Brown Decl, pp. 38, 202.

19       Examination of the injunctive relief measures that the environmental plaintiffs

20   seek to compel by way of mandatory injunction also indicates a long-term approach.  Of

21   the six measures that plaintiffs demand, four are not even scheduled to occur during the

22   reinitiated consultation period.  Others call for planning steps or studies without any on

23   the ground effects that could either cause of prevent irreparable harm to the species.

24   ///

25   ///

26   _____

27       [6] Plaintiffs' opening brief states unequivocally that the six additional actions sought by way of
     mandatory injunction "cannot be delayed any longer due to the urgent need to reduce the primary
     stressors on the listed fish populations."  ECF No. 29-1, Case No. 2:13-cv-00059, 17:24-26, citing Gary

28   Reddy Decl. ¶ 17.

1  To warrant a preliminary injunction, however, the environmental plaintiffs must show that

2  each item of injunctive relief they seek is necessary to avoid irreparable harm to the

3  listed species during the interim period.  See South Yuba River Citizens League v.

4  NMFS, 804 F. Supp. 2d 1045, 1057 (E.D. Cal. 2011)

5        The first item that the environmental plaintiffs propose, the development and

6  implementation of fish passage at Englebright and Daguerre by July 2018, "will provide

7  no benefit to the listed species in the interim period" and therefore must be denied.  Id.

8  The second request, which calls for three times as much gravel placement than that

9  agreed to by the Corps (15,000 tons versus 5,000 tons) has also not been shown to

10  prevent irreparable harm within the next 10 months.  The third measure, implementation

11  of a long-term channel plan, would not occur at the earliest until 2019, more than four

12  years after the interim period now under consideration has expired.  The fourth proposed

13  item of mandated relief, placement of more woody debris for fish growth and survival, is

14  negated by the Corps' already stated willingness to begin placement of such material

15  this year.  Fifth, the proposed predation control measures are not scheduled to be

16  implemented until 2015 and the biological status quo will not be altered in the interim.

17  Sixth and finally, the development of a green sturgeon monitoring and  management

18  plan will not be implemented until 2016 and therefore will also have no effect on the

19  status quo in the meantime.

20        While the Court recognizes the environmental plaintiffs' concern that these

21  measures must in some instances be started, at least for planning purposes, in the near

22  future in order to be completed by the applicable deadlines, any harm during the

23  meantime has not been quantified at all, much less to the extent necessary to justify the

24  extraordinary relief represented by a mandatory injunction.  The requested injunction is

25  denied.

26  ///

27  ///

28  ///

1

**A.      Federal Motions for Stay and/or Remand**

2

3        Having determined that Plaintiffs in the SYRCL case have not established the

4    propriety of a mandatory preliminary injunction, the Court must now consider whether

5    either the SYRCL or the YCWA case should be stayed while the reinitiation proceedings

6    take place over the coming 10 months.  The federal defendants argue that it is wasteful

7    and inefficient to litigate compliance with multi-decade conservation measures in the

8    2012 BiOp,  given the fact that an ongoing Section 7 consultation is in process that will

9    produce a new BiOp likely superseding the 2012 BiOp in any event.  The Court agrees.

10

11        **1.      Standard**

12

13        A power to stay proceedings is "incidental to the power inherent in every court to

14    control the disposition of the causes on its docket with economy of time and effort for

15    itself, for counsel, and for litigants."  Landis v. N. Am. Co., 299 U.S. 248, 254 (1936).  A

16    court may enter a stay "pending resolution of independent proceedings which bear upon

17    the case… whether the separate proceedings are judicial administrative or arbitral in

18    character..."  Leyva v. Certified Grocers of Cal., Ltd., 593 F.2d 857, 863-64 (9th Cir.

19    1979).  This is true even if the issues in such proceedings are not necessarily controlling

20    with respect to the action before the court.  Id.  In exercising its discretion, the court must

21    evaluate the competing interests affected by either granting or refusing a stay, including

22    "the hardship or inequity which a party may suffer in being required to go forward, and

23    the orderly course of justice measured in terms of the simplifying or complicating of

24    issues, proof, and questions of law which could be expected to result from a stay."

25    Lockyer v.Mirant Corp. 398 F.3d 1098, 1110 (9th Cir. 2005) (citation omitted).

26    ///

27    ///

28    ///

1          2.      **Analysis**

2

3          The federal defendants contend that because reinitiation will likely resolve,

4    narrow, or clarify the issues, a stay will avoid "wasteful duplication of effort." Chronicle

5    Publ'g. Co. v. Nat'l. Broad. Co., 294 F.2d 744, 747-48 (9th Cir. 1961).   Significantly, too,

6    where agencies proposed to resolve disputed issues administratively,  courts should

7    ordinarily "allow agencies to cure their own mistakes rather than wasting the courts' and

8    the parties' resources reviewing a record that both sides acknowledge to be incorrect or

9    incomplete." Ethyl Corp. v. Browner, 989 F.2d 522, 524 (D.C. Cir. 1993).  These

10   principles apply with particular force in the context of complex environmental regulatory

11   schemes like that encompassed by the ESA.  See, e.g., Lands Council v. McNair,

12   629 F.3d 1070, 1074 (9th Cir. 2010).

13          As the government posits, "[f]orcing Defendants to proceed in the instant litigation,

14   when it is already clear that the outcome of the [administrative proceedings] will impact

15   the final resolution of this case, would be prejudicial." J.M. Martinac Shipbuilding

16   Corp. v. Washington, 2007 WL 445438 at *4 (W.D. Wash 2007).  Defendants maintain

17   that without a stay, the parties will be required to litigate, and the Court to adjudicate, the

18   same fundamental issues that are already being reconsidered by the involved agency,

19   here NMFS.  Moreover, as the federal defendants also point out, a stay is prudent in

20   order to avoid "potentially inconsistent results" that could occur if the pending litigation

21   and the administrative reinitiation were to proceed simultaneously.   See Cal. Dep't of

22   Water Res. v. Powerex Corp., 653 F. Supp. 2d 1057, 1065 (E.D. Cal. 2009).  In addition,

23   the government also represents that forcing the litigation to proceed would divert scarce

24   agency resources from the ongoing ESA consultation.  Finally, defendants correctly

25   point out that scientific judgments and technical analyses are ordinarily matters within

26   the agency's particular expertise, and are accordingly more efficiently and effectively

27   resolved by the agency itself.

28   ///

1  See Lands Council v. McNair, 629 F.3d at 1074 (9th Cir. 2010) (reviewing court must be

2  "at its most deferential" with respect to such matters).  According to Defendants, that

3  factor also points towards permitting the NMFS to resolve disputed issues with respect to

4  the 2012 BiOp prior to judicial involvement.

5         As already set forth above with respect to the environmental plaintiffs' preliminary

6  injunction request, there is no evidence that species' viability will be imperiled in any

7  concrete way during the coming year.  Pending completion of the new BiOp, the Corps

8  will continue to maintain the safety and security of the dams, and will also continue to

9  carry out measures beneficial to fish, to the extent it concludes it has the statutory

10  authority to do so.  The Court concludes a stay of the SYRCL litigation is appropriate

11  under those circumstances with the caveat that deadlines will be imposed with respect to

12  completion of both the preliminary biological assessment and the subsequent biological

13  opinion as requested by the SYRCL and agreed upon by the government.  The Court

14  has equitable discretion to set a reasonable schedule in that regard.  See Ctr for

15  Biological Diversity v. Norton, 212 F. Supp. 2d 1217, 1221 (S.D. Cal. 2002) (in remand

16  context).

17         With regard to the YCWA action, the issue is somewhat different since the plaintiff

18  power companies are concerned that absent an immediate decision on the merits of the

19  2012 BiOp, their ability to obtaining hydroelectric relicensing from FERC may be

20  compromised.  YCWA and PG&E worry, for example, that in the long run, modification to

21  the Englebright and Daguerre dams will be detrimental to their interest in using hydraulic

22  head created by the dams for hydropower and water diversion.  Under the terms of the

23  existing RPA, however, no such modification would occur until 2020 at the earliest.  In

24  addition, the 2012 BiOp contains no terms affecting any existing FERC license (see

25  2012 BiOp, Ex. A. to Decl. of Howard Brown, 2:13-cv-00042, ECF No. 44-3, p. 152)  and

26  FERC has already concluded that because the 2012 BiOp is "under revision and is

27  under legal review," it does not constitute "new information relative to the ongoing

28  hydroelectric relicensing process."   Howard Decl., ¶ 13.

1    Nonetheless, fearing that the 2012 BiOp could be an issue in the future, YCWA asks, if

2    the case is stayed, that the Court's Order contain provisions that NMFS will not cite nor

3    rely on the 2012 BiOp in any future filings with FERC, that NMFS will not directly nor

4    indirectly rely on the 2012 as precedent.  The Federal Defendants have expressed no

5    opposition to those conditions and they will be incorporated within the Court's order as

6    set forth below.

7          The Court recognizes that the federal defendants' motion in the YCWA case

8    initially requests this Court remand the matter back to NMFS for further consideration,

9    with the YCWA action being dismissed in the meantime.  In the SYRCL case, however,

10   only a stay of proceedings is sought.  Voluntary remand, like whether to grant a stay, is a

11   matter within the Court's inherent power.  See Trujillo v. Gen'l  Elec. Co., 621 F.2d 1084,

12   1086 (10th Cir. 1980).   As counsel for the government conceded at the time of oral

13   argument, there is no significant difference between those two remedies.  In the Court's

14   view, because NFMS has already agreed to reinitiate proceedings, which a remand

15   would have accomplished, a simple stay makes sense in order to permit that already-

16   begun reinitiation process to run its course.

17

18                              **CONCLUSION**

19

20         For the reasons set forth above, Plaintiff SYRCL's Motion for Preliminary

21   Injunction (ECF No. 29 in Case No. 2:13-cv-00059-MCE-EFB) is DENIED.   The federal

22   defendants' Motion For Stay of Proceedings in Case No. 2:13-cv-00059-MCE-EFB is

23   GRANTED. The federal defendants' Motion for Voluntary Remand or Stay of

24   Proceedings (ECF No. 44 in Case No. 2:13-cv-00042-MCE-CKD) is DENIED with

25   respect to remand but GRANTED with regard to the alternatively requested stay.

26   ///

27   ///

28   ///

1    IT IS FURTHER ORDERED as follows:

2        1.    By October 22, 2013, the Corps shall submit to NMFS the final biological

3    assessment required for NMFS, in turn, to complete a new biological assessment for the

4    Project/

5        2.    By May 12, 2014, NMFS shall issue its final biological opinion for the

6    Project.

7        3.    The stay as to both related cases shall be automatically lifted, without

8    further court order, upon issuance of said final biological opinion.

9        4.    During the pendency of reinitiation proceedings, which will conclude with

10   issuance of NMFS' final biological opinion, the Corps is directed to continue its ongoing

11   efforts to ameliorate any adverse effects of the project upon the subject fish.  Said

12   measures are to include a)  inspection and maintenance of the Daguerre fish ladders;

13   b)  placement and monitoring of 5,000 tons of gravel for spawning habitat; c) salmonid

14   redd surveys as specified in the 2012 BiOp; and d)  placement and monitoring of large

15   woody material between Englebright and Daguerre, as also called for in the 2012 BiOp.

16       5.    During the pendency of the reinitiation process, NMFS will not cite nor rely

17   on the 2012 BiOp or its RPAs, in any further filings with FERC involving relicensing

18   proceedings for  a) Plaintiff YCWA's Yuba River Development Project; b) Plaintiff-

19   Intervenor Nevada Irrigation District's Yuba-Bear Hydroelectric Project; or c) Plaintiff-

20   Intervenor Pacific Gas and Electric Company's Drum-Spaulding Project.  NMFS is

21   further directed, during the same period, not to directly or indirectly rely on the 2012

22   BiOp or any of its provisions for purposes of establishing the environmental baselience

23   in any consultations regarding the aforementioned relicensing proceedings.

24   ///

25   ///

26   ///

27   ///

28   ///

20

1    Given the stays being ordered by this Court as set forth above, the following

2 motions are DENIED as moot, without prejudice to being reinitiated if and when the stays

3 are lifted:  a)  Plaintiffs' Joint Motion for Partial Summary Judgment in Case No. 2:13-cv-

4 00059-MCE-CKD (ECF No. 64); b)  Plaintiffs' Motion for Partial Summary Judgment in

5 Case No 2:13-00042-MCE-EFB (ECF No. 20); and c) Federal Defendants' Motion for

6 Stay of Summary Judgment Proceedings in Case No. 2:13-cv-00042-MCE-CKD (ECF

7 No. 67).

8    IT IS SO ORDERED.

9 Dated:  August 12, 2013

10

11

12                                    _____

MORRISON C. ENGLAND, JR, CHIEF JUDGE

13 UNITED STATES DISTRICT COURT

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28